UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF  NEW YORK

_____

JOHNATHAN SKARDINSKI,

                                        Plaintiff                    DECISION AND ORDER

-vs-
                                                                     15-CV-6486 CJS

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                                        Defendant.
_____

APPEARANCES

For the Plaintiff:              Howard D. Olinsky, Esq.
                                Olinsky Law Group
                                One Park Place
                                300 South State Street, Suite 420
                                Syracuse, New York 13202

For the Defendant:              Benil Abraham, Esq.
                                Social Security Administration
                                Office of General Counsel
                                26 Federal Plaza, Room 3904
                                New York, New York 10278

                                Kathryn L. Smith, A.U.S.A.
                                Office of the United States Attorney
                                for the Western District of New York
                                100 State Street, Room 620
                                Rochester, New York 14614

INTRODUCTION

     This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant"),

which denied the application of Johnathan Skardinski ("Plaintiff") for Social Security

1

Disability Benefits ("DIB") and Supplemental Security Income Benefits ("SSI").  Now before the Court is Plaintiff's motion (Docket No. [#8]) for judgment on the pleadings and Defendant's cross-motion [#12] for judgment on the pleadings.  Plaintiff's application is denied and Defendant's application is granted.

BACKGROUND

The reader is presumed to be familiar with the parties' submissions, which contain detailed recitations of the pertinent facts.  The Court has reviewed the record and will offer only a brief summary of those facts.  Plaintiff claims to be disabled due to both physical impairments and psychological impairments, which include degenerative disc disease in the cervical and lumbar spines, as well as bipolar disorder, depression and anxiety.

In April 2004 Plaintiff was treated at St. Joseph's Hospital in Syracuse, "due to wanting help for ongoing drug use [(cocaine, ecstasy and marijuana)]" and a [history of] bipolar disorder." T. 371.  Plaintiff reported having two prior hospitalizations, in or about 2002, for intentional drug overdoses. T. 380, 386, 394.  At that time Plaintiff indicated that he had quit his job due to increased stress, T. 394, but he apparently found other employment subsequently, because he continued to have reported earnings through 2005. T. 218.  The hospital's diagnosis was "bipolar disorder NOS" and "polysubstance dependence." T. 379.  Upon discharge, the hospital prescribed lithium and risperdal, and recommended follow-up treatment.

Shortly thereafter, Plaintiff was incarcerated for seven years, between 2005 and 2012.  The Ambulatory Health Record covering Plaintiff's period of incarceration indicates that while he was in prison, he carried a diagnosis of "adjustment disorder,"

2

but did not receive medication or other treatment for that condition, or for any psychologically-based problem. T. 318-325.  While in prison, Plaintiff filed the subject application for disability benefits.

In August 2012, Plaintiff was released from prison.  Plaintiff claims to have made a brief attempt to work later that month, picking milkweed pods.  Other than that, Plaintiff has not worked since before he was incarcerated.  Shortly after being released, Plaintiff had a parole violation, which he described as involving "consuming beer when providing emotional support to a friend who had a death in his family." T. 420.

On May 6, 2013, Plaintiff told his doctor that he smokes 3-4 packs of cigarettes per day. T. 454 ("He smokes 3/4 PPD.").

In May and June of 2013, almost a year after being released from prison, Plaintiff underwent a psychological assessment at the request of his parole officer. T. 419.[1]  The evaluation was performed at Oswego Hospital Behavioral Services ("Oswego Behavioral").  Plaintiff reported that he had long-standing problems with anxiety, feeling overwhelmed, and lacking focus and concentration. T. 419.  However, Plaintiff expressed irritation at having to attend the evaluation, indicating that he was not sure why it was needed, since "he ha[d] his depression and anxiety under control." T. 420. Plaintiff expressed "no interest" in consulting with a doctor "regarding medication." T. 421, 426.  Plaintiff also declined the evaluator's suggestion that he contact VESID ("Vocational and Educational Services for Individuals with Disabilities"), stating that he

---

[1]The report from that evaluation indicates that the parole officer wanted Plaintiff evaluated because of Plaintiff's "history of mental health services in prison where he was also treated for depression." T. 419.  However, as noted earlier, Plaintiff's prison ambulatory health record contains no mention of such treatment.

"did not want to have to be forced to work," and that he had a disability application pending. T. 421, 429.

Shortly after this psychological evaluation, on June 13, 2013, Plaintiff and his attorney attended a disability hearing before an Administrative Law Judge ("ALJ"), however, the ALJ adjourned the hearing because he had received virtually no evidence in support of Plaintiff's claim at that time. Subsequently, while his attorney was attempting to gather a medical record to support his disability claim, Plaintiff returned to Oswego Behavioral for "medication management, treatment and general support," even though he denied having any symptoms, was not taking medication, and had previously indicated that he was not interested in treatment. T. 423. At that time, it appears that Plaintiff grossly misstated his medical history to the treatment provider, by stating that he had "at least 10 (per Pt. report)" prior "psychiatric hospitalizations." T. 423.[2] At least, that figure is inconsistent with the rest of the record. *See*, T. 386 (three prior admissions); 394 (two admissions in 2002 for overdoses). Plaintiff's mental status examination was essentially normal, and he indicated that he spent his time playing video games "excessively." T. 423-424. Oswego Behavioral started Plaintiff on medication, even though he had indicated that he was asymptomatic without medication. T.423 ("At present time, Mr. Skardinski denies symptoms.").

On December 10, 2013, Plaintiff and his attorney again appeared for a hearing before the ALJ. During the hearing, Plaintiff testified concerning his impairments,

---

[2]The record, including the pre-hearing brief submitted by Plaintiff's attorney, indicate that Plaintiff had *three* hospital visits at most concerning his anxiety condition and bipolar disorder. See, e.g., T. 308, first paragraph.

4

though his testimony was notably vague in most respects, even in response to simple questions.[3]  Plaintiff testified that he has a driver's license and drives about once per day. T. 43.  Plaintiff indicated that he stopped working not because of disability but because he was sent to prison, and that since being released from prison eighteen months earlier (August 2012), he had made only one attempt at working, which, as previously mentioned, involved "picking milkweed pods," part-time. T. 44.  Plaintiff could not recall how many hours he had worked at that job, T. 45, and he has no reported earnings after 2005. T. 218-222.[4]  Plaintiff, who had applied for disability benefits while still in prison, T. 213, testified that he was required to seek work as a condition of his parole, but not if he applied for disability. T. 54.  Plaintiff indicated that he spends his days doing household chores, caring for pet parakeets and playing video games. T. 59-62.

Plaintiff indicated that he has pain in his back, which feels like "a knife stuck in [his] back at all times," and pain in his neck, which feels "like somebody took a baseball bat to it." T. 46.  Plaintiff stated that he can sit for 20-30 minutes at a time before needing to change position. T. 47-48.  Plaintiff stated that his back hurts after standing for one minute, and that he can stand for only 20 minutes before needing to sit down of lie down. T. 48.  Plaintiff, who is 6' 4" and weights 200 pounds, indicated that he can lift

---

[3]As just one example, when asked if he shared his apartment with anyone or if he lived alone, Plaintiff gave the vague and  non-responsive answer, "I have a friend that's helping me out." (T. 43).  From other evidence in the record it appears that Plaintiff actually resided with his girlfriend, who supported him financially T. at pp. 60-61; *id.* at 420-421 ("Johnathan is currently living with his girlfriend in an apartment that they rent. . . . Currently Johnathan is supported through his girlfriend's employment.").

[4]The only years for which Plaintiff has reported earnings are 1997-2005. T. 218.  Plaintiff has never shown reported earnings of more than ten thousand dollars per year, and his average annual reported earnings over that period is $5,234. T. 218.

only "five pounds[,] [m]aybe ten." T. 48.

When asked how his bipolar disorder affects his daily life, Plaintiff gave a rather

vague, unresponsive answer:

> I mean I've experienced  the manic highs and stuff like that, and that –
> well, but the manic depression part of it too, because it's mostly the
> depression part more than the highs, because you've got the highs and
> the lows.  Until I understood more about it – it's hard to say.  It's –
> because it's confusing.  Because it's chemicals in the brain, and it's hard
> to explain it to somebody that really if they don't know. [sic]  There's
> different types of bipolar I and II, and so it's – [.]

T. 49.  When asked how his bipolar disorder affected his ability to work in the past,

Plaintiff stated:

> It just eventually got to me.  That's what it does is just eventually over time
> it just – it might be little things, but it's just things that would just like all
> right. [sic]  I can't take it no more.  You know it's just the – same routine
> thing, too.  That — it like irked me.
>
> It's just the same thing day-in and day-out.  There's no change in the
> routine or nothing, and it would – that would drive me crazy too.  Like mind
> is just like need something different. [sic]  Need change.  I don't know.
> That's like a way of explaining that part of it, too.  Plus also it's just like
> you know maybe it might be my back or at the time bothering me too.
>
> It's just added stress all combined over time, and it's just like I get to the
> point where it's like mind and body fighting.  You know what I'm saying?
> Because the body's hurting, and then the mind's like can't deal with this.
> It's so much.  It's overwhelming and – so, it just became a battle
> eventually, and then it's like all right.
>
> I'm not even doing my job here properly or correctly because I've got all
> this going on in my head and everything, and maybe eventually – I've had
> this just like I'm sorry, my performance isn't you know – I have to go.
> That's usually what happens.  It happened in the past.

T. 50.  When asked if he experienced anxiety, Plaintiff indicated that he had suffered

one panic attack, for which he did not seek medical attention.  T. 51.  Plaintiff stated that

since being released from prison he had seen a mental health therapist three or four

times,[5] but could not remember the therapist's name, and that medication "seem[ed] to

be helping with the anxiety and stress and irritability."  T. 56.  Plaintiff also testified that

he had received medication for his mental impairments "on a regular basis" while in

prison, T. 62, though the prison medical record does not mention such treatment.  T.

318 (list of conditions includes "adjustment disorder," but list of medications pertains to

back pain, not mental health); 428 (Stating, apparently based on Plaintiff's self report,

"While in prison, Johnathan was prescribed Zoloft which caused disruptions in his sleep

as he reports to have been without sleep for some five days," suggesting that Zoloft

was tried and discontinued.).

Plaintiff's counsel was unsuccessful in obtaining medical source opinions from

Plaintiff's treatment providers.[6]  Consequently, following the hearing, the ALJ obtained

medical interrogatories from two non-treating non-examining experts -- a psychiatrist,

Aaron Satloff, M.D. ("Satloff"), and an orthopedic surgeon, Thomas F. Scott, M.D.

("Scott").  Scott indicated that according to the medical record, Plaintiff's physical

impairment was degenerative disc disease of the cervical and lumbar spines, with no

---

[5]It appears that Plaintiff actually only attended treatment sessions on two occasions (September 27, 2013 and October 25, 2013), while the other occasions were part of the aforementioned evaluation performed at the direction of his parole officer. T. 423-429.

[6]As mentioned earlier, the ALJ had initially attempted to conduct the hearing on June 13, 2013, but adjourned the hearing because he had received virtually no evidence in support of Plaintiff's claim at that time.  Even with that adjournment, Plaintiff was unable to obtain medical source statements from his doctors, because they were unwilling to provide them. *See*, Transcript ("T.") at 40.

evidence of nerve root compression.  Scott opined that Plaintiff was unable to perform "repeated bending, lifting [and] stooping," but "should be able to carry out light work activity." T. 481.  Scott stated that Plaintiff could occasionally lift and carry up to 20 pounds, and could frequently lift and carry 10 pounds; could sit for two hours at a time and for six hours in a workday; stand for one hour at a time and for four hours in a workday; walk for one hour at a time and for three hours in a workday; frequently use both hands and feet; frequently claim stairs and balance; and occasionally climb ladders, stoop, kneel, crouch and crawl.  In making these findings, Scott indicated that there was a "paucity of objective findings" in the record to support any further limitations than those that he identified. T. 488.

As for psychiatric findings, Satloff indicated that Plaintiff had generalized anxiety disorder and bipolar disorder, which would cause only "mild" restrictions in daily living, social functioning, and ability to maintain concentration, persistence or pace. T. 490-491.  Satloff stated that Plaintiff would have "moderate" restrictions in understanding, remembering and carrying-out complex work instructions and in making complex work-related decisions, but would have only "mild" restrictions in understanding, remembering and carrying-out simple work instructions and in making simple work-related decisions. T. 495.  Satloff opined that Plaintiff might have mild restriction in responding appropriately to work situations and changes in routine, but would have no restrictions in his ability to interact with the public, supervisors or co-workers. T. 496.  Satloff further indicated that Plaintiff would be able to perform "some of his previously held jobs." T. 494.  The ALJ proffered Satloff's and Scott's reports to Plaintiff's counsel, who declined to respond to them. T. 11.

8

On April 7, 2014, the ALJ issued a Decision (T. 11-20), denying Plaintiff's claim. Applying the familiar five-step sequential analysis for Social Security disability claims, the ALJ found, at the first and second steps, that Plaintiff had not engaged in substantial gainful activity at any relevant time, and that he had the following severe impairments: "degenerative disc disease in the cervical and lumbar spines." (T. 13-16). The ALJ concluded, though, that Plaintiff's generalized anxiety disorder and bipolar disorder were not severe impairments. (T. 16-17).

In the Court's experience, ALJs most often conduct a brief discussion of the medical evidence at steps two and/or three of the sequential analysis, and then, prior to step four, make a more extensive examination of the entire medical record in connection with the RFC finding.  Typically, it is also during such discussion of the RFC finding that ALJ's indicate the weight that they are giving to the various medical opinions.  Here, however, the ALJ chose to review and discuss essentially all of the medical evidence of record as part of his analysis at Step Two of the sequential analysis, T. 13-17, and then conduct a more-limited discussion in connection with his RFC finding. T. 17-18.  In particular, the ALJ's step-two discussion spans 3.5 pages, while his RFC discussion is approximately 1.5 pages.

Consequently, as part of his step-two discussion, the ALJ explained the weight that he was giving to various opinions.  For example, the ALJ indicated that he accorded "great weight" to Satloff's opinion, stating in pertinent part:

> Dr. Satloff responded to his medical interrogatory on January 22, 2014. He opined that the claimant, in regard to the period beginning with the alleged onset date of October 1, 2005, to date, had a generalized anxiety disorder and a bipolar disorder.  However, the symptoms had only

9

presented mild limitation of daily living activities, mild limitation maintaining social functioning and mild limitation maintaining concentration, persistence or pace. . . . Dr. Satloff is a recognized medical expert, board certified in psychiatry.  Based on his professional expertise, programmatic familiarity and review of all of the medical evidence of record, *the undersigned assigns great weight to his opinion and, relying on it, finds that the claimant's medically determinable impairments of anxiety disorder and bipolar disorder have not caused and do not cause more than minimal limitations in the claimant's ability to perform basic mental work activities*.  The mental impairments are not severe.

T. 16 (emphasis added).  In this regard, the ALJ referred to Satloff's "opinion" as consisting of "Exhibit 20F," which includes two documents: 1) a form that indicates the claimant's diagnoses and then tracks the "B" and "C" criteria for listed impairments, T. 490-494; and 2) a statement of the claimant's ability to do work-related mental activities, T. 495-497.  As previously noted, in the second document, Satloff indicated that Plaintiff would have "moderate" restrictions in understanding, remembering and carrying-out complex work instructions and in making complex work-related decisions, but only "mild" restrictions in understanding, remembering and carrying-out simple work instructions, making simple work-related decisions and responding appropriately to work situations and changes in routine.  Inasmuch as the ALJ indicated that he was giving great weight to Satloff's opinion, consisting of Exhibit 20F, the Court understands that the ALJ gave great weight to the entire exhibit.

At the third step of the sequential analysis, the ALJ found that Plaintiff's impairments did not meet or medically-equal a listed impairment. T. 17.

Prior to reaching the fourth step of the sequential analysis, the ALJ found that Plaintiff had the following residual functional capacity: "[C]laimant has the residual

functional capacity to perform the full range of light work[.]" (T. 17).  As can be seen, this RFC finding does not include any restriction for non-exertional impairments.  In this regard, the ALJ's RFC analysis does not mention Satloff's report, and contains only the following reference to Plaintiff's mental impairments: "He is being seen at Oswego Mental Health, but has only been there four times and could not  remember the name of his counselor.  Medication helps with his irritability and anxiety." T. 18.

At the fourth step of the sequential analysis, the ALJ found that Plaintiff cannot perform his past relevant work. T. 18.  However, at the fifth and final step of the analysis, the ALJ found, by application of the Medical-Vocation Rules ("the grids"), Rule 202.18, that Plaintiff is not disabled. T.19.  More specifically, the ALJ applied the grids for a "younger individual," with a "limited education," "able to communicate in English," with previous work experience of "skilled or semiskilled -- skills not transferable." Medical-Vocational Rule 202.18.  The grids similarly direct a finding of "not disabled" for such persons with non-transferable unskilled work experience or no work experience. *See*, Rule 202.17.

On August 14, 2015, Plaintiff commenced this action.  In moving for judgment on the pleadings, Plaintiff contends that the ALJ's RFC determination is the product of legal error and is not supported by substantial evidence, for two reasons: 1) "[T]he ALJ failed to acknowledge, discuss, or assign weight to the functional assessment completed by Dr. Satloff," referring to the second of the two documents contained in Exhibit 20F; and 2) "[t]he ALJ failed to properly evaluate Plaintiff's credibility pursuant to the regulations."  Defendant opposes Plaintiff's application and cross-moves for judgment on the pleadings.

11

STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the

Commissioner of Social security as to any fact, if supported by substantial evidence,

shall be conclusive."  The issue to be determined by this Court is whether the

Commissioner's conclusions "are supported by substantial evidence in the record as a

whole or are based on an erroneous legal standard."  *Schaal v. Apfel*, 134 F.3d 496,

501 (2d Cir. 1998).  Substantial evidence is defined as "more than a mere scintilla.  It

means such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion."  *Id.*

DISCUSSION

Plaintiff first contends that the ALJ erred by failing to "acknowledge, discuss, or

assign weight to the functional assessment completed by Dr. Satloff."[7]  Plaintiff further

contends that such error was harmful, "as the RFC includes absolutely no

corresponding limitations for mental impairments, such as limitation to unskilled work."[8]

Defendant responds that the ALJ's failure to mention the work-related-activities portion

of Satloff's report does not require remand, since that report was "generally consistent"

with Satloff's other report, which the ALJ discussed.  Alternatively, Defendant contends

that any error in that regard is harmless, since, even if the ALJ had incorporated the

limitations identified in Satloff's work-related-activities report into the RFC, Plaintiff

would still have been found disabled under the grids.

---

[7]Pl. Memo of Law [#9] at p. 9.

[8]Pl. Memo of Law [#9] at p. 9.

Preliminarily, the Court notes that Plaintiff is not challenging the ALJ's determination that his non-exertional impairments are not severe, or any other aspect of the ALJ's decision except the two mentioned above.  Plaintiff argues that the RFC finding should have included some limitation for his non-exertional impairments, which would have eroded the light-work occupational base somewhat, such as by limiting him to unskilled light work.[9]  However, Plaintiff does not expressly argue that he would have been found disabled if the ALJ had included the limitations in Satloff's work-related-activities report into the RFC. [10]

Against this backdrop, Plaintiff's primary argument is that the ALJ "fail[ed] to evaluate and weigh the functional assessment completed by Dr. Aaron Satloff."[11]  The Court disagrees that the ALJ failed to evaluate or weigh Satloff's functional assessment.  As previously noted, the functional assessment to which Plaintiff refers is included in Exhibit 20F, which the ALJ gave "great weight." T. 16.  Although the ALJ made this statement in the context of his step-two analysis, the Court understands the statement as referring to all of Exhibit 20F, which includes the work-related-activities report.  As the Court noted earlier, the ALJ's step-two discussion was not limited to evidence bearing directly upon that step of the sequential analysis; rather, the ALJ

---

[9]Pl. Memo of Law [#9] at p. 10.

[10]Plaintiff has not submitted any opinion evidence that he is unable to work.  Rather, the only opinion evidence of record is from Scott and Satloff, both of whom indicate that Plaintiff is capable of working.*See*, T. 481 (Scott: "[S]hould be able to carry out light work activity."); T. 494 (Satloff: "Can do some of his previously held jobs.").  Plaintiff's motion for judgment on the pleadings does not challenge the reports of Scott or Satloff; rather, it merely contends that the ALJ failed to properly consider Satloff's report and his own testimony.

[11]Pl. Memo of Law [#9] at p. 9.

conducted an extensive discussion of all of the medical evidence of record in his step-two analysis.  Accordingly, the Court finds that the ALJ adequately explained the weight that he was giving to Satloff's opinion overall, including Satloff's statement concerning work-related activities.

Plaintiff alternatively argues that the ALJ's decision is erroneous because the RFC finding does not adopt the limitations set forth in Satloff's work-related-activities report.  That is, the RFC finding does not include any limitation due to nonexertional impairments.  Plaintiff contends that the absence of such limitations in the RFC finding is "harmful" and "prejudicial," since such limitations "support[ ] his claim."[12]  However, Defendant responds that any such error is harmless, since even if the ALJ had included Plaintiff's nonexertional limitations in the RFC, Plaintiff still would have appropriately been found not disabled under the grids.[13]

It is clear that an ALJ must consider both severe- and non-severe impairments when making an RFC determination. *Parker-Grose v. Astrue*, No. 11-52-cv, 462 F.App'x 16 (2d Cir.  Jan. 6, 2012).  Moreover, it is legal error for an ALJ to fail to "account," in the RFC determination, for "limitations arising from [a claimant's non-severe] mental impairment that were established by substantial evidence in the record. *Id.*, 462 F.App'x  at *18.  However, an ALJ's failure to expressly include non-exertional impairments in the RFC finding does not warrant remand, provided that the RFC findings afford an adequate basis for meaningful review, apply the proper legal

---

[12]Pl. Memo of Law [#9] at p. 10.

[13]Def. Memo of Law [#12-1] at pp. 10-11.

14

standards and are supported by substantial evidence. *See*, *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014)("As the Commissioner concedes, the Step Four residual functional capacity finding did not explicitly include McIntyre's non-exertional functional limitations. However, Step Four findings need only afford an adequate basis for meaningful judicial review, apply the proper legal standards, and be supported by substantial evidence such that additional analysis would be unnecessary or superfluous.") (*citing Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013), internal quotation marks omitted).

Furthermore, remand is not required for harmless errors. *See, e.g., Gishey v. Colvin*, No. 8:13-CV-1036 LEK/ATB, 2015 WL 1505674, at *11 (N.D.N.Y. Mar. 31, 2015) ("A plaintiff's need to avoid concentrated exposure to respiratory irritants has only a minimal impact on her ability to perform sedentary work.  Even if the ALJ had considered and adopted the environmental limitations contemplated by Dr. Wassef and Dr. Medved, it would not have altered his analysis at step five and his conclusion, based solely on the Grids, that plaintiff could perform other, sedentary work. Hence, any error arising from the ALJ's failure to explicitly address these environmental limitations in assessing plaintiff's RFC was harmless.") (citations and internal quotation marks omitted).

In the instant case, while Plaintiff is correct that the ALJ's RFC discussion does not mention the work-related non-exertional limitations identified in Satloff's reports, any such error in that regard is harmless.  From the ALJ's step-two discussion, it appears that he concluded that the non-exertional limitations identified in Satloff's work-related

activities report simply had a negligible effect on Plaintiff's ability to work, which is why

he did not include them in the RFC.  In that regard, the ALJ noted, in both his step-two

and step four discussions, that while Plaintiff apparently suffers from anxiety and bi-

polar disorder, Plaintiff claims that those conditions are well-controlled with medication.

T. 16.  The ALJ further noted that when Plaintiff sought evaluation for his alleged

mental impairments at the insistence of his parole officer, he told the evaluator that "he

was not interested in either individual counseling or in consultation with a psychiatrist

regarding medication." T. 15.  The ALJ briefly alluded to such evidence as part of his

RFC analysis, T. 18, after having conducted a more extensive discussion of that

evidence at step two .

Moreover, the ALJ expressly acknowledged that he was required to consider "all

of the claimant's impairments, including impairments that are not severe," when making

an RFC determination. T. 13.  The ALJ nevertheless used the grids to find that Plaintiff

was not disabled, which reflects the ALJ's belief that Plaintiff's nonexertional

impairments did not have a significant impact on his ability to work. *See, Mitchell v.*

*Colvin*, No. 14 CV 04154, 2015 WL 5306208, at *7 (S.D.N.Y. Sept. 10, 2015) ("While

the ALJ did not state the degree to which non-exertional limitations compromised the

plaintiff's ability to work at all exertional levels, his decision to use the grids as a

framework for decisionmaking necessarily reflects his conclusion that the plaintiff's

non-exertional limitations did not significantly compromise the plaintiff's ability to

perform such work.").  To the extent that the ALJ declined to expressly list Plaintiff's

nonexertional limitations in the RFC finding, after concluding that such impairments had

a negligible effect on Plaintiff's ability to work, the Court believes that such

16

determination is supported by substantial evidence. *See, Wages v. Comm'r of Soc. Sec.*, No. 3:11-CV-1571 JCH, 2013 WL 3243116, at *6 (D. Conn. June 26, 2013) (Rejecting argument that remand was required because ALJ failed to include non-severe impairments in RFC, where non-severe impairments did not affect the claimant's ability to work: "Wages claims that the ALJ failed to consider her non-severe impairments—particularly, her asthma—when determining her RFC. However, . . . the ALJ found that Wages' asthma was non-severe and did not cause any functional limitations or that any limitations were minimal at best.").

However, even assuming that the ALJ erred by failing to include all of the limitations contained in Satloff's work-related-functions report in the RFC finding, such error would not have prevented the ALJ from still using the grids to find that Plaintiff is not disabled.  In that regard, the Court reiterates that according to Satloff, Plaintiff had only "moderate" restrictions in understanding, remembering and carrying-out complex work instructions and in making complex work-related decisions, and only "mild" restrictions in understanding, remembering and carrying-out simple work instructions, making simple work-related decisions and responding appropriately to work situations and changes in routine. T. 495-496.  Moreover, the ALJ found that Plaintiff's anxiety and bipolar disorder are well-controlled by medication, and "have not caused and do not cause more than minimal limitation in [Plaintiff's] ability to perform basic mental work activities." T. 16.  Such slight non-exertional limitations would not prevent the ALJ from using the grids. *See, Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986) (Indicating that use of the grids is not permitted where "a claimant's nonexertional impairments significantly limit the range of work permitted by his exertional limitations.") (citation

17

omitted); *see also, Wallis v. Commissioner of Social Security*, No. 09–CV–1075 (TJM/VEB), 2010 WL 3808303 at *12 (N.D.N.Y. Aug. 5, 2010) (Affirming the ALJ's use of the grids, stating: "Although there is some evidence of mild or moderate limitations imposed by Plaintiff's mental impairments, there is no indication that those limitations so narrow Plaintiff's possible range of work so as to deprive her of a meaningful employment opportunity.") (Report and Recommendation adopted by 2010 WL 3806824 (N.D.N.Y. Sep. 22, 2010)).   Accordingly, the ALJ could have appropriately used the grids to find that Plaintiff is not disabled even if the nonexertional impairments had been expressly included in the RFC finding.   Indeed, the only alleged harm identified by Plaintiff is that the ALJ should have limited Plaintiff to unskilled work, which would not have resulted in a different outcome. *See*,  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00 (b) (grids are based on availability of unskilled jobs).

Consequently, any error in that regard is harmless. *See*, *Sherman v. Commissioner of Social Security*, No. 7:14–CV–0154, 2015 WL 5838454 (N.D.N.Y. Oct. 7, 2015) (The court  concluded that the ALJ's failure to specifically discuss the claimant's non-severe impairments as part of the RFC finding was either not error or harmless error, because the ALJ's discussion at Step Two of the sequential analysis established that the non-severe impairments resulted in little or no restriction of the claimant's RFC); *see also*, *Trombley v. Colvin*, No. 8:15-CV-00567 (TWD), 2016 WL 5394723, at *17–18 (N.D.N.Y. Sept. 27, 2016) ("Although the ALJ indicated that he had given careful consideration to the entire record in determining Plaintiff's RFC, he did not expressly address Plaintiff's non-severe impairments in his RFC analysis.  While the

ALJ may not have specifically mentioned non-severe impairments by name in his RFC analysis, the record as a whole shows that he did evaluate those impairments and their possible limiting effects and found those limitations to be non-existent or *de minimis*, thereby rendering any legal error on his part harmless.") (citations omitted).

Plaintiff next contends that the ALJ failed to properly evaluate his credibility pursuant to the regulations.  On this point, Plaintiff contends that the ALJ did not properly assess his statements about his subjective complaints concerning his mental and physical impairments:

> The ALJ should have considered whether the record supports Plaintiff's testimony that he has trouble with stress and irritability, he has difficulty concentrating, he suffers anxiety which increases with work stress, his back pain interferes with [his] ability to lift and reach, he cannot stand still without significant pain, and he can comfortably lift only 10 pounds.

Pl. Memo of Law [#9] at p. 12.  Plaintiff contends that the ALJ's discussion of his credibility amounts to mere boilerplate, which "fails to address the regulatory factors or identify any support in the record as to why Plaintiff's subjective complaints are not credible." *Id*.

Defendant responds that the "ALJ provided several specific and supported reasons for discounting Plaintiff's subjective complaints," including the following: 1) Plaintiff only sought a psychiatric assessment because his parole officer required him to do so; 2) Plaintiff told the evaluator at Oswego Behavioral that his anxiety and depression were under control; 3) Plaintiff told the evaluator at Oswego Behavioral that he was not interested in further evaluation or treatment; 4) Plaintiff told the evaluator at Oswego Behavioral that he was not interested in contacting VESID because he did not

want to be forced to work; 5) Plaintiff refused to have a recommended steroid injection for back and neck pain in 2008; 6) Plaintiff's back and neck pain were "mainly medically managed"; and 7) Plaintiff can perform light work, according to Dr. Scott.  The Court observes, however, that while the ALJ indeed noted all of those points and more, he did not expressly cite them as "reasons" for finding Plaintiff's subjective complaints to be not fully credible.

Administrative Law Judges are required to evaluate a claimant's credibility concerning pain according to the factors set forth in the Commissioner's regulations, which state, in relevant part:

> In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. By objective medical evidence, we mean medical signs and laboratory findings as defined in § 404.1528 (b) and (c). By other evidence, we mean the kinds of evidence described in §§ 404.1512(b)(2) through (8) and 404.1513(b)(1), (4), and (5), and (d). These include statements or reports from you, your treating or nontreating source, and others about your medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how your impairment(s) and any related symptoms affect your ability to work. We will consider all of your statements about your symptoms, such as pain, and any description you, your treating source or nontreating source, or other persons may provide about how the symptoms affect your activities of daily living and your ability to work.
>
> ***
>
> In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings and statements about how your symptoms affect you. (Section 404.1527 explains how we consider opinions of your treating source and other medical opinions on the existence and severity of your symptoms, such as pain.) We will then

determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work.

20 C.F.R. § 404.1529(a); 20 C.F.R. § 416.929(a).  The regulation further states, in relevant part:

> Factors relevant to your symptoms, such as pain, which we will consider include:
> (i) Your daily activities;
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms;
> (iii) Precipitating and aggravating factors;
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
> (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3); 20 C.F.R. § 416.929(c)(3).

However, while an ALJ is required to consider these factors, he is not required to explicitly discuss each one. *See, Pellam v. Astrue*, 508 F.App'x. 87, 91, 2013 WL 309998 at *3 (2d Cir. Jan. 28, 2013) ("*Pellam*") ("The ALJ did not apply an incorrect legal standard when judging the credibility of Pellam's testimony. Although the ALJ did not explicitly discuss all of the relevant factors, Pellam has failed to point to any authority requiring him to do so. In any event, the ALJ cited the applicable regulation, 20 C.F.R. § 404.1529, explicitly mentioned some of the regulatory factors (such as Pellam's limited use of pain medication), and stated that he considered all of the evidence required by § 404.1529.").  If it appears that the ALJ considered the proper

21

factors, his credibility determination will be upheld if it is supported by substantial evidence in the record. *Id*.

In the instant case, the ALJ's discussion of Plaintiff's credibility in connection with the RFC finding is rather brief, and essentially indicates that Plaintiff's complaints are not fully credible to the extent that they go beyond what is supported by the medical evidence, which the Court understands to mean the medical evidence as interpreted by both Dr. Scott and Dr. Satloff, whose opinions the ALJ gave great weight. T. 18. However, once again, the ALJ's RFC discussion refers back to his more-thorough discussion of the entire record at step two of the sequential analysis, in which he pointed out various facts which cast doubt on Plaintiff's claims concerning the limiting-effects of his mental and physical impairments.  The Court has included many of those facts above, such as the fact that Plaintiff has apparently not made any serious attempt to work since prior to his incarceration, and is not interested in VESID.  Other factors which the ALJ pointed out include the following: The record does not indicate that Plaintiff followed up with treatment for bipolar disorder after being hospitalized in 2004 (T. 14); in 2008 Plaintiff sought treatment for "knife twisting" pain in his back, but upon examination "there was no radiculopathy and pain was not reproduced with palpation" (T. 14); and Plaintiff declined a steroid injection for back pain, and then apparently did not receive further treatment for four years (T. 14).

Additionally, the ALJ indicated that he gave great weight to the medical opinions of Scott and Satloff, both of whom reviewed the medical evidence and concluded that Plaintiff is capable of working, contrary to what he claims.  As just one example, Scott indicates that Plaintiff is capable of lifting and carrying up to twenty pounds occasionally

22

and ten pounds frequently, while Plaintiff claims to be able to lift only "five pounds[,] [m]aybe ten." T. 48.

The foregoing observations by the ALJ pertain to factors set forth in 20 C.F.R § § 404.1529(c)(3) & 416.929(c)(3).  Additionally, the ALJ specifically stated that in making his RFC determination, he "considered all symptoms and the extent to which th[o]se symptoms [could] reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p." T. 17.   Moreover, the Court finds that the ALJ's credibility finding is supported by substantial evidence, as discussed above.  Accordingly, the Court concludes that the ALJ did not err in assessing Plaintiff's credibility. *See,Pellam*, 508 F.App'x at 91 (ALJ did not err, even though he did not explicitly discuss all relevant credibility factors, because his decision cited the applicable regulation, explicitly mentioned some of the regulatory factors, stated that all evidence required by the regulation had been considered, and was supported by substantial evidence).

## CONCLUSION

Plaintiff's application for judgment on the pleadings [#8] is denied, and Defendant's cross-motion [#12] for judgment on the pleadings is granted.  The action is dismissed.

So Ordered.

Dated: Rochester, New York     ENTER:
    March 3, 2017

                             /s/ Charles J. Siragusa
                             CHARLES J. SIRAGUSA
                             United States District Judge